NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0101n.06

No. 20-3392

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Feb 24, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DUAY JOSEPH JADO, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW |
| | ) | FROM THE UNITED STATES |
| MONTY WILKINSON, Acting Attorney General, | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| Respondent. | ) | |
| | ) | |

BEFORE:     ROGERS, DONALD, and BUSH, Circuit Judges.

ROGERS, Circuit Judge.  Petitioner Duay Joseph Jado, a lawful permanent resident of the United States found removable for committing several serious crimes, was denied deferral of removal under the Convention Against Torture by an Immigration Judge in late 2017.  He seeks review of the Board of Immigration Appeals' ("BIA") third refusal to remand to the Immigration Judge for consideration of additional evidence with respect to that determination.  Each denial was based on the absence of new evidence showing materially changed country conditions in Iraq with respect to Chaldean Christians.  Relief is not warranted, however, because the BIA's decision to deny Jado's latest motion was not an abuse of its discretion.  Our recent decision in another case involving a Chaldean Christian, *Marqus v. Barr*, 968 F.3d 583, 587 (6th Cir. 2020), remanding to the BIA for further consideration, does not require a remand here.  In the course of reviewing three consecutive motions to consider intervening evidence since his hearing before the Immigration

1

Judge, the BIA provided adequate explanation for our review of its determination that country conditions had not materially changed over the relevant intervening period.

Jado was born in Greece to Iraqi parents and was admitted to the United States as a refugee in June 1979. His status was adjusted to lawful permanent resident in July 1980. Between 1997 and 2003, Jado was convicted of various crimes including theft, attempted burglary, aggravated battery in a public place, and burglary, for which his sentences varied from probation to up to four years in prison.

On August 12, 2005, the Department of Homeland Security commenced removal proceedings against Jado. On October 24, 2005, the immigration judge ("IJ") ordered Jado removed to Iraq under 8 U.S.C. § 1227(a)(2)(A)(iii), which authorizes deportation for "[a]ny alien who is convicted of an aggravated felony[.]" Jado did not file an appeal. The government was unable to execute the removal order because of "Iraq's longstanding policy of not issuing the requisite travel documents for repatriation."

In March 2017, the United States reached an agreement with Iraq for repatriation of Iraqi nationals with final orders of removal. Exec. Order No. 13,780, 82 Fed. Reg. 13209, 13212 (Mar. 6, 2017). Jado filed a motion to reopen his removal proceedings, seeking leave to apply for deferral of removal under the Convention Against Torture ("CAT") due to the increased risk of torture Jado believed he would face in Iraq as a Chaldean Christian. 8 C.F.R. §§ 1208.16(c)(3), 1208.17. The IJ granted Jado's motion and reopened his case based on the likelihood of changed conditions in Iraq since his order of removal in 2005. On November 28, 2017, however, the IJ denied Jado's application for CAT deferral, following a hearing in which submitted written evidence was discussed, but no significant testimony was taken. AR 2267-89. For nine pages, the IJ recounted in detail an expert statement submitted by Jado and two expert statements submitted by the

government regarding conditions for returning Iraqi Christians. Based on the totality of this evidence, the IJ found that Jado had not met his burden to establish that it was more likely than not that he would be tortured by, or with the acquiescence of, the Iraqi government if returned to Iraq. The IJ gave weight to the government experts because they were based on first-hand knowledge and were based on more current information. The IJ reasoned:

> While [the government experts Rubin and Ollivant] acknowledge that returnees may be questioned and even detained upon their arrival in Iraq, they make clear that such detention is meant to determine whether individuals have ties to the former Ba'athist regime, if they had defected from the Iraqi military, or if they have previously committed a crime inside Iraq. If they do not have identification documents, they may be detained until their identity can be confirmed. They both state that the likelihood of detained individuals being tortured is low.
>
> Rubin and Ollivant also assert, as does the Department of State's 2016 Human Rights Report for Iraq, that the Iraqi government is investigating abuses by the PMF. . . . Moreover, Rubin contends that the end of the war against Da'esh has meant increasing accountability for the PMF. Ollivant alludes to the existence of an "Iraqi Christian militia" found within the PMF that has been working to secure the Christian population in the Ninewah province. Indeed, he asserts that returnees may be detained by and/or "have concerns" with the PMF only if they have ties to Da'esh. However, respondent's long residence in the United States - rather than make him a target of the PMF - essentially exonerates him. Ollivant asserts that Iraqi Christians in particular, such as respondent, should not be concerned about their "Westernization" because the fact that they were in the West "makes them almost certainly innocent" of any connection to Da'esh, and both Ollivant and Rubin emphasize that Western influences are not unwelcome or uncommon in Iraq.

Jado appealed the IJ's evidentiary and merits rulings to the BIA and sought to introduce new evidence in support of his CAT claim. In particular, one expert opinion dated December 2017, of Daniel Smith, a researcher who had lived in Iraq since 2007, set forth the particular contentions as to how Christians being returned to Iraq might be tortured. He contended that Iraqi nationals who are deported to Iraq from the United States, especially those who are suspected of having criminal records, will be detained upon arrival in Iraq and interrogated by internal security forces, and that the conventional practice for Iraqi Security forces included physical violence, isolation, and other techniques that qualify as torture. He asserted that suspicion of American

espionage and other negative intervention in Iraq permeates the country, and that the suspicion is aggravated by reports that deportees have been convicted of major crimes, and that the declarations of experts like Rubin and Ollivant do not meaningfully rebut this information. The Smith declaration also described the threat of torture from Iran-backed Shi'a militias, and the Iraqi track record of failing to protect its minority Christian citizens.

On May 24, 2018, the BIA dismissed Jado's appeal and denied his request to consider new evidence, which it treated as a motion to remand. Analyzing the Smith declaration, along with the other expert declarations presented for the first time on appeal, the BIA wrote: "[t]he declarations of Rebecca Heller, Mark [Lattimer], Daniel Smith, and Shamiran Mako, including their curriculum vitae, are duplicates of evidence before the Immigration Judge; or if new, the respondent has not demonstrated that this evidence was unavailable or undiscoverable prior to the Immigration Judge's November 28, 2017, decision . . . ." Reiterating the grounds for the IJ's decision, the BIA noted that the IJ had broad discretion to weigh the evidence and that Jado had failed to demonstrate clear error in the IJ's findings of fact. The BIA affirmed the IJ's determination that Jado failed to show that he was more likely than not to be tortured in Iraq, particularly in light of "the roll-back of Da'esh territory and influence in Iraq." The BIA further concluded that the evidence post-dating the IJ's 2017 decision only showed that civil strife was ongoing, but "does not establish that Iraqi officials, or members of government-affiliated militias, are targeting or seeking to torture Christians or returnees from the United States." Thus because Jado could not demonstrate that he faced a particularized threat of torture in Iraq, he did not state a valid claim for deferral under the CAT. Jado did not seek judicial review of this decision.

Instead, on August 27, 2018, Jado filed a motion to reopen and/or reconsider the BIA's decision dismissing his appeal. The BIA denied the motion on September 6, 2019. The BIA first

noted that if the motion were construed as a motion to reconsider, then it was untimely and failed to present an "adequate basis" for reconsideration because the motion did not identify any argument the BIA overlooked or any errors of law or fact in its prior decision. The BIA instead construed it as a motion to reopen immigration proceedings and remand for consideration of new evidence. Jado again presented various expert declarations to support his argument that conditions in Iraq had materially changed since the IJ's 2017 decision, including updated declarations from Mark Lattimer and Smith. Smith's affidavit contended that deportees did not receive proper identification when returned to Iraq, putting them at greater risk of torture from anti-American militias like the Popular Mobilization Forces ("PMF"), a majority-Shi'a militia, who would be suspicious and hostile toward anyone with a connection to the United States, a lack of proper identification, and/or a criminal record. Analyzing the updated expert declarations and other evidence submitted, the BIA again concluded that Jado's evidence did not merit remand. The BIA explained its decision as follows:

> The evidence proffered with the motion reflects, and the respondent does not dispute, that discrimination, harassment, and episodes of violence against Christians in Iraq is a long-standing and ongoing problem. Most of the "newly" proffered expert opinions, country information, and news articles are largely cumulative of the evidence previously submitted and considered by both the Immigration Judge and the Board in dismissing the respondent's appeal and denying his motion to remand, including evidence relevant to the risks faced by repatriated undocumented Iraqis in Iraq, and the feasibility of their relocating to safety. The "newly" submitted affidavit of Mr. Daniel Smith . . . is not appreciably different from Mr. Smith's declarations that have previously been included in the record. In addition, the deposition transcript of Mr. Michael Bemanke and the declaration of Belkis Willie offer no new significant insights into the longstanding and ongoing problems faced by undocumented Iraqi deportees from the United States, including their ability to move or settle freely within Iraq.

> When viewed with the evidence previously included in the record, the evidence proffered with the present motion does not reflect materially changed circumstances or country conditions since the Immigration Judge's November 2017 decision or our decision of May 24, 2018, that affect this respondent's eligibility for protection under the Convention Against Torture. . . . Rather, such evidence seemingly manifests a continuance of the ongoing and often times volatile

circumstances that gave rise to the respondent's first claim, which was denied by both the Immigration Judge and this Board.

Moreover, there is nothing in the evidence proffered by the respondent relating to his personal circumstances that is sufficient to satisfy the materiality requirement of 8 C.F.R.§1003.2(c)(3)(ii). The proffered evidence does not reflect that the government or any other person or organization in Iraq has ever exhibited or expressed an interest in the respondent. Such evidence does not reflect that there exists a reasonable possibility that the respondent would be targeted for harm rising to the level of torture. That the respondent may be a member of a certified class in federal litigation that has received international attention does not, standing alone, support the conclusion that any alleged threat to the respondent's safety in Iraq has escalated since the time of his November 2017 merits hearing such that reopening based on changed country conditions or circumstances should be granted.

The BIA held that Jado's motion was time-barred, because it was filed three days after the expiration of the 90-day filing deadline applicable to motions to reopen removal proceedings. 8 C.F.R. § 1003.2(c)(2). The BIA concluded that Jado did not meet the time-bar exception under 8 C.F.R. § 1003.2(c)(3)(ii), because: (1) he did not show that conditions in Iraq had materially changed, only that preexisting volatile circumstances were ongoing, and (2) he could not establish prima facie eligibility for CAT deferral based on his inability to show that he would likely be tortured. Jado also did not seek judicial review of this determination, made by the BIA in September 2019.

Instead, Jado filed a second motion to reconsider and/or reopen for further proceedings on October 7, 2019. The BIA denied the motion on March 19, 2020, again construing it as a motion to reopen proceedings and remand for consideration of new evidence for the same reasons discussed in its previous decision. The BIA found that Jado's motion was both time-barred, because it came more than 90 days after the final administrative order of deportation, and number-barred because noncitizens subject to deportation may typically only file one motion to reopen.

Reviewing the new evidence submitted with the motion, the BIA found that Jado once again had not shown that conditions in Iraq had materially changed or that he faced a likely threat

of torture "with or without the acquiescence of the government." The BIA first explained that the 2018 Department of State International Religious Freedom Report on Iraq did not show that conditions in Iraq had changed such that Jado would be more likely than not to be tortured. The BIA also dismissed the 2018 Department of State Human Rights Report discussing crimes committed by the PMF, concluding that Jado had not shown that based on the report, "he personally would more likely than not be tortured by the PMF." The BIA was also not persuaded by Jado's updated expert declarations. The BIA held that Jado's updated declarations from Smith described only incremental changes in Iraq, not materially changed conditions. The Colonel Steven Miska affidavit describing increased anti-American sentiment did not show materially changed circumstances that would affect Jado, because the general changes described by Miska were "insufficiently fundamental to support reopening." The BIA further stated that it was not persuaded that the declarations from Belkis Wille, Scott Portman, and Lattimer, reflected changes that were "significant enough to warrant reopening." Finally, the BIA held that a 2019 State Department travel advisory for Iraq was not persuasive, because Jado did not argue that the advisory specifically related to him and did not "persuasively argue that the advisory establishes materially changed country conditions in Iraq" on his claim. Thus, the BIA concluded that Jado did not persuasively show "material changed country conditions that would establish a prima facie case that he would qualify for the requested relief of deferral of removal under the Convention Against Torture." 8 C.F.R. § 1208.17.

Jado timely filed this appeal. He contends that the BIA erred in denying his motion to reopen, noting that he presented significant evidence that was previously unavailable, including expert declarations and State Department reports describing how conditions in Iraq have deteriorated for Christians following the victories against Da'esh. He argues that the evidence he

presented with his motion to reopen shows that he is at significant risk of torture due to multiple factors: he is Christian, has never been to Iraq, does not speak Arabic, and has lived his entire life in the United States. Jado requests that this court grant his petition for review and remand to the BIA.

The BIA's decision denying Jado's motion did not constitute an abuse of discretion because the BIA thoughtfully and rationally explained why the submitted evidence was not persuasive. We have said that "[t]he BIA abuses its discretion if its decision was made 'without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination.'" *Ishac v. Barr*, 775 F. App'x 782, 789 (6th Cir. 2019) (quoting *Ahmed v. Mukasey*, 519 F.3d 579, 585 (6th Cir. 2008)). There is no such abuse here.

The BIA denied Jado's motion on two grounds. First, it concluded that the motion did not meet the time- and number-bar exception because he did not demonstrate that country conditions in Iraq had materially changed since the IJ's 2017 decision denying his CAT claim. *See* 8 C.F.R. § 1003.2(c)(2). *See also Trujillo Diaz v. Sessions*, 880 F.3d 244, 249 (6th Cir. 2018). Second, it held that Jado did not persuasively show "material changed country conditions that would establish a prima facie case that he would qualify for the requested relief of deferral of removal under the Convention Against Torture." The BIA did not abuse its discretion in reaching these conclusions.

Jado contends that the BIA abused its discretion by conducting only a "cursory analysis" of the evidence. This argument is without merit. The BIA identified and addressed the key exhibits supporting the motion, describing why it did not find the submitted evidence persuasive. Jado states that he presented 21 new exhibits totaling near 350 pages in support of his motion, but this fact has little bearing on his case. It is not the quantity of evidence that matters, but its substance. Here, the evidence does not show that conditions in Iraq have materially changed or

that Jado was reasonably likely to face a personal threat of torture. The party seeking to reopen immigration proceedings bears the "heavy burden" of showing that the new evidence is material, meaning that if proceedings were reopened, the new evidence "would likely change the result in the case." *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 320-21 (6th Cir. 2018) (quoting *Matter of Coelho*, 20 I. & N. Dec. 464, 472-73 (B.I.A. 1992)). Jado has not shown that any of the evidence he submitted would be sufficient to change the outcome here.

First, the BIA did not abuse its discretion because it rationally concluded that Jado's evidence did not show materially changed conditions in Iraq. Specifically, Jado failed to identify any facts or evidence showing that conditions have materially worsened for Iraqi Americans or Chaldean Christians relative to 2017, when the Iraqi government was dealing with the remnants of Da'esh and attempting to establish order after the war. To determine whether country conditions have materially changed, the BIA must compare "the evidence of country conditions submitted with the motion to those that existed at the time of the merits hearing below." *Bi Feng Liu v. Holder*, 560 F.3d 485, 491 (6th Cir. 2009) (quoting *Matter of S-Y-G-*, 24 I. & N. Dec. 247, 253 (B.I.A.2007)).

In *Liu*, we observed that the relevant merits hearing from which to measure the motion to reopen was the IJ's final order of removal, meaning the critical period for determining whether conditions had changed was between the time when the IJ ordered removal and when Liu filed his motion to reopen before the IJ. *Id.* Here, although Jado received his final order of removal in 2005, his claim for deferral of removal under the CAT was decided on the merits in 2017. Accordingly, the merits hearing relevant to this case is likely the IJ's 2017 decision denying Jado's CAT claim. However, the extensive procedural background in this case complicates the determination of which proceeding should be used to measure changed conditions. Given that the

motion at issue here is identical to Jado's original motion to reopen filed in August 2018, and he did not seek judicial review of the BIA's September 2019 denial of that motion, the critical time period to measure changed conditions is arguably from the filing of the previous motion to reopen in 2018. The parties offer no guidance on this issue. Jado presents no argument on appeal as to what the critical time period is, while the Government declines to identify the time period, instead arguing that country conditions have not changed regardless of the hearing used to measure changed conditions.

Were we to measure from the 2018 motion to reopen, our analysis would turn on whether Jado's newly proffered evidence differs from the evidence previously submitted to the BIA such that it now persuasively demonstrates changed country conditions. The narrower timeframe would significantly diminish Jado's chances of meeting this burden, particularly because our analysis would consider the two previous decisions from the BIA denying Jado's request for remand. Several of Jado's updated expert declarations, such as those from Smith, Lattimer, and Wille, rely on information from 2018 and earlier that was already considered by the BIA. Indeed, Jado's primary contentions relating to the risk of torture upon arrival in Iraq or the lack of proper identification at PMF checkpoints were presented in previously submitted affidavits from Smith and others, and these contentions were squarely addressed by the BIA. Thus, Jado likely would not be able to show changed country conditions were we to measure conditions from the filing of his 2018 motion to reopen. We need not decide the issue here, however, because even taking the IJ's 2017 decision as the relevant merits hearing from which to begin our analysis, as the BIA appeared to do, Jado has not demonstrated that conditions in Iraq have materially changed since then.

The BIA rationally concluded that Jado's evidence did not show that conditions had materially changed in Iraq since late 2017. Analyzing Jado's expert declarations, the BIA noted that the evidence merely described "incremental changes" that "would be expected in the volatile atmosphere of contemporary Iraq," not changes that were material to Jado's situation. "Change that is incremental or incidental does not meet the regulatory requirements for late motions [based on materially changed country conditions]." *Matter of S-Y-G*, 24 I. & N. Dec. at 257. Jado makes no argument and identifies no evidence showing that the BIA erred in its determination that the evidence only showed incremental changes. Furthermore, Jado points to no evidence showing that material changes would be more likely to occur in post-war volatile Iraq than just incremental changes.

Additionally, Jado argues that the proffered evidence demonstrates the "escalation of human rights violations and violent atrocities in Iraq." Even accepting that this is true and adequately shown by the evidence, it does not mean that country conditions have changed in a way that is material to Jado's situation. As the BIA noted, the evidence describes the situation in Iraq as being volatile, but it does not show that this volatility is a new feature arising only after 2017. Violent conditions, particularly with respect to minority populations, existed well before Jado's initial claim for CAT protection. Our precedent makes clear that "[p]roof that a preexisting condition continues is insufficient to establish changed country conditions." *Xiu Dong Lin v. Holder*, 574 F. App'x 623, 623 (6th Cir. 2014). Although some violent conditions may persist today, the fact that there is ongoing violence against religious minorities does not mean that conditions have become more hostile for Chaldean Christians and American Iraqis, much less that Jado is more likely than not to be tortured. Indeed, Jado's evidence describes more than just violence against Chaldean Christians, it also describes how members of other religious groups,

such as the Sunnis, have also been targeted for abuse. General escalation of hostilities against non-majority religious groups is not the same as a material worsening of conditions for Christians in Iraq.

With respect to the declarations of Smith, which from our reading of the record most specifically detail a context for the torture said to await minority Iraqis returned after being convicted of crimes in the United States, the BIA reasoned:

> The respondent asserts that the declarations of Daniel Smith . . . establish changed country conditions for individuals who return to Iraq. However, while we acknowledge that the declarations describe volatile conditions, and incremental changes in government responses to those conditions, we are not persuaded that they show materially changed country conditions since the date of the Immigration Judge's decision. The declarations describe incremental changes that are the type of changes that would be expected in the volatile atmosphere of contemporary Iraq. We are not persuaded that the described changes are sufficiently fundamental to support reopening.

Additionally, the BIA concluded that even if the Miska expert declaration is correct that anti-American sentiment in Iraqi society has increased, this does not show that such conditions would specifically affect Jado. A general dislike of America or the American government does not make it likely that an Americanized Iraqi would be tortured by or with the acquiescence of the government. While Jado's evidence describes the volatile conditions in Iraq, discrete instances of harassment and abuse toward Christians, and the poor conditions for detainees, these elements are insufficient to meet the heavy burden of showing that conditions have worsened in a way that would personally affect Jado's situation as a deportee living in Iraq. Thus, because the evidence only generally describes preexisting volatility and ongoing violent conditions, the BIA did not abuse its discretion when it concluded that Jado failed to show that country conditions have materially changed since late 2017.

Second, the BIA did not abuse its discretion when it determined that Jado had not established a prima facie case of eligibility for CAT relief, because he presented no evidence showing that he personally faced a likely threat of torture with the acquiescence of the Iraqi government. Because Jado has never lived in Iraq, he must essentially show that just being a Chaldean Christian who has lived a long time in the United States by itself means that he will be tortured. The BIA did not abuse its discretion in determining that he failed to make this showing. To qualify for deferral of removal under the CAT, an applicant "must demonstrate that she faces a particularized and likely threat of torture at the hands of a public official, or with the consent or acquiescence of a public official." *Marqus*, 968 F.3d at 587 (citing 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1); *Almuhtaseb v. Gonzales*, 453 F.3d 743, 751 (6th Cir. 2006)). Furthermore, "a motion to reopen based on changed country conditions cannot rely on speculative conclusions or mere assertions of fear of possible [torture], but instead must offer reasonably specific information showing a real threat of individual [torture]." *Harchenko v. INS*, 379 F.3d 405, 410 (6th Cir. 2004) (citations and internal quotation marks omitted). To warrant reopening, Jado must "present evidence that reveals a reasonable likelihood that the statutory requirements for relief have been satisfied." *Diaz*, 880 F.3d at 249-50 (citations and internal quotation marks omitted). Although the proffered evidence does suggest that torture is a "widespread practice" in Iraq, especially for those who are imprisoned, this does not indicate that Jado himself is reasonably likely to be detained let alone tortured. A general risk of discrimination or abuse does not make torture likely absent more specific evidence or argumentation.

Jado has not identified any facts in the record evidence that would suggest he faces a "particularized and likely threat of torture" with the consent of the Iraqi government. In fact, of the 21 exhibits submitted, the only evidence Jado specifically refers to in arguing that the BIA

erred in its findings of fact is the 2018 Department of State International Religious Freedom Report for Iraq. The BIA directly addressed the report in its decision, observing that nothing in the report suggests that conditions in Iraq have materially changed to the point that "he would now be more likely than not to be tortured by, or with the acquiescence of, the Iraqi government." The fact that religious freedom conditions in Iraq have generally worsened does not show that Jado personally is at greater risk of torture. Likewise, that the Iraqi government is unable or unwilling to provide security for religious minorities similarly does not mean that torture is likely or that it would be done by, or with the acquiescence of, the Iraqi government. It could simply mean the government is stretched too thin and does not have the resources to protect all vulnerable individuals. While the State Department reports do suggest that conditions in Iraq continue to be poor for religious minorities, they do not establish a reasonable likelihood that Jado faces a "particularized and likely threat of torture" from an Iraqi government official.

The BIA did not, as Jado argues, require that he identify the "name, rank, and badge number" of the person likely to torture him. Rather, he needed to show that his personal characteristics made it reasonably likely that he would be singled out for torture with the acquiescence of a public official. The only entity Jado identifies that could potentially meet the "public official" requirement is the PMF. He argues that the PMF, which has now been incorporated into the Iraqi government, operates with impunity and retains "aggressive, hostile, and violent attitudes to the United States and Christian Iraqis." But the BIA directly addressed this point, noting that even if Jado established that the PMF's official status has changed since the IJ's 2017 decision, the evidence did not show that he personally was more likely than not to be tortured by the PMF. Indeed, Jado's evidence describes how Iraqi Christians have reported various incidents of harassment and abuse at PMF-controlled checkpoints, but this showing does not

establish that the PMF would be likely to target him for torture. Temporary delays, restrictions, or other abuse from suspicious checkpoint personnel may be onerous, but they do not rise to the level suggesting an intent to detain and torture someone like Jado. Furthermore, discrete instances of harassment, restrictions on movement, and terrorist attacks against Chaldean Christians are insufficient to show that Jado personally faces a likely threat of torture based on his religious affiliation. Our precedent demonstrates that an applicant seeking to establish a likelihood of being individually targeted for torture "cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual [torture]." *Diaz*, 880 F.3d at 250 (quoting *Harchenko*, 379 F.3d at 410). Jado merely speculates that the PMF could torture him, but offers no specific evidence demonstrating that the PMF would seek to single him out individually for torture. Thus, the BIA rationally concluded that the evidence did not show that Jado could establish a prima facie case for eligibility under the CAT.

Jado presents a generic criticism of the BIA's decision but fails to point out specific evidence identifying a change in conditions since the IJ's 2017 decision. He has not identified particular facts in the record evidence showing that it is more likely he will be tortured than in 2017. Thus, he has not met the requirements for the time- and number-bar exception based on changed country conditions under 8 C.F.R. § 1003.2(c)(2). Additionally, Jado failed to identify any new facts showing that he personally would face a likely threat of torture from the government or with its acquiescence. Because Jado did not establish a prima facie case for CAT relief, he failed to carry the "heavy burden" necessary to warrant reopening, and the BIA properly exercised its discretion to conclude that Jado's motion failed on this ground as well.

Jado argues that our recent decision in *Marqus v. Barr*, 968 F.3d 583 (6th Cir. 2020), requires that we remand this case. This argument is unavailing. The depth and detail in the BIA's three decisions addressing additional and supplemented evidence in this case makes it readily distinguishable from the cases cited in *Marqus*, where we held that remand was necessary when the BIA "cursorily denied" an applicant's motion to reopen. *Id.* at 592. Unlike in *Preçetaj v. Sessions*, 907 F.3d 453, 458–60 (6th Cir. 2018), the BIA here did not "den[y] relief in a five-sentence single paragraph." *Marqus*, 968 F.3d at 592. Also, unlike in *Hanna v. Mukasey*, 290 F. App'x 867, 872–73 (6th Cir. 2008)*,* the BIA did not deny Jado's claim in a single "summary, conclusory" paragraph. *Marqus*, 968 F.3d at 593. Most significantly, the BIA did not deny Jado's motion "with little more than a bald statement," as was the case in *Marqus* itself. *Id.*

Here, the BIA issued a several-page decision analyzing Jado's key evidence and his contentions based on that evidence. Across multiple paragraphs, the BIA acknowledged various items of record evidence but explained why their contentions were not persuasive and did not satisfy either ground for denial. Considering that this was the third denial of a motion to reopen, based on evidence cumulative with that presented the previous two times Jado was before the BIA, the level of detail in the BIA's decision here was sufficient. Also, unlike in *Marqus*, the BIA here did address the conclusions in the State Department's Human Rights and Religious Freedom Reports, noting that even if the PMF has become more prominent, nothing in the reports showed that the PMF or any other government-affiliated entity would likely torture Jado. 968 F.3d at 593. The BIA analyzed all six of Jado's expert declarations, acknowledging their major contentions and explaining why the affidavits were not persuasive. Alongside the expert declarations and both State Department reports, the BIA also addressed why the 2019 U.S. Commission on International Religious Freedom Report and 2019 State Department Travel Advisory for Iraq did not save Jado's

motion. This discussion of the evidence, and any new facts raised, was much more detailed than what is described in *Marqus*, particularly in light of the previous rulings in Jado's case. Jado's failure to point to any specific facts in the record evidence that the BIA overlooked demonstrates that the BIA carefully considered all of the relevant issues in rendering its decision.

Jado argues that the BIA erred because its decision "fails to discuss or analyze the majority of this evidence," referring to his submission of 21 exhibits. This argument is without merit. Jado does not argue that the evidence not explicitly referenced in the BIA's decision raised issues that the BIA overlooked in its analysis. We have held that "[t]hough it need not write an exegesis on every contention, the BIA must consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Diaz*, 880 F.3d at 255 (citation and internal quotation marks omitted). By analyzing the expert declarations, State Department reports, and other key documents, the BIA explained its evaluation of the issues relevant to Jado's motion, certainly to the extent that the evidence may have demonstrated a change in conditions. Thus, Jado has failed to demonstrate that the BIA abused its discretion by opting not to discuss the remaining evidence, mainly news stories and articles from human rights organizations, by name in its decision.

The BIA was not required to name every single exhibit in its analysis, especially in light of its finding that the evidence was largely cumulative with Jado's prior submissions. After the IJ's 2017 decision, the BIA considered new evidence submitted by Jado on three separate occasions: the 2018 decision dismissing Jado's CAT appeal, the 2019 decision denying Jado's first motion to reopen, and the 2020 decision at issue here. The BIA observed in its analysis that the new evidence in this case was "similar" to the evidence previously submitted with his 2019 motion to reopen. The BIA went on to declare, "[w]e stated [in 2019] that most of the newly

submitted evidence was cumulative of the evidence previously submitted and considered by both the Immigration Judge and the Board in dismissing [Jado's] appeal and denying his motion to remand." "Evidence that is 'largely cumulative' of that already in the record does not meet the burden required for reopening." *Matter of S-Y-G-*, 24 I. & N. at 253 (quoting *Matter of Coelho*, 20 I. & N. Dec. at 474)). The BIA thus did not abuse its discretion when it determined that the evidence here was not persuasive enough to warrant reopening.

The BIA rationally explained that Jado's evidence here was cumulative of the evidence expressly considered in 2019, which itself was cumulative of the evidence expressly considered by both the IJ and BIA in Jado's initial CAT claim proceedings. Indeed, expert declarations from Lattimer, Smith, and Wille were previously submitted to the BIA in Jado's previous two proceedings. In Jado's direct appeal of the IJ's 2017 decision, he submitted to the BIA a 2018 State Department Travel Advisory for Iraq, which is almost identical to the 2019 Travel Advisory submitted with the motion in this case. Jado's deliberate choice not to seek judicial review of either the 2018 or 2019 BIA decisions indicates that he could not demonstrate any errors in the BIA's fact-finding with respect to the evidence proffered earlier. Because the issues have remained the same across Jado's extensive efforts to litigate this case, and the evidence here is largely similar to what the BIA already analyzed, the BIA was not required to identify and discuss each exhibit by name, and Jado failed to carry his burden of showing that consideration of the proffered evidence would likely change the outcome of his case. Thus, the BIA did not abuse its discretion by addressing the major contentions presented in Jado's evidence and concluding that denial was appropriate because the motion was time- and number- barred and did not establish a prima facie case for relief from removal under the CAT.

In short, Jado's briefs now before us point to nothing specific in his third submission of supplemental evidentiary material to the BIA that shows a change from the situation that the BIA addressed in the decisions of earlier years, decisions that Jado did not seek review of in our court. Without such guidance, given the BIA's explanations each time that the new submissions were cumulative and did not show more than an incremental material change in circumstances, the record is sufficient to conclude that the BIA did not abuse its discretion in finding no basis for reopening. Accordingly, we deny Jado's petition for review.